JOHNSTONE, Justice
(dissenting).
I respectfully dissent. The learned trial judge erred to reversal in three of his rulings.
First, the trial judge did err in refusing to instruct the jury on assault in the third degree as a lesser offense included within the charged crime of child abuse. While the record contains plenty of evidence to convict the defendant of child abuse, as he was charged and convicted, nonetheless, the record contains countervailing evidence, as the opinion issued by the Court of Criminal Appeals acknowledges in these words:
“T.D.T. testified in his defense that he had never kicked his son or banged his son’s head on a concrete floor. He testified that discipline was his responsibility, but that he used spankings only as a last resort. (R. 384.) He testified that his daughter would sometimes crawl into bed with him, but he denied ever touching his daughter with his private parts or in any other inappropriate way.”
T.D.T. v. State, 745 So.2d 885, 889 (Ala. Crim.App.1998). In affirming the trial judge’s refusal to instruct the jury on the lesser included offense of assault in the third degree, the Court of Criminal Appeals and the majority of this Court disregard the prerogative of the jury to believe some of the prosecutor’s evidence but not all of it as it pertains not only to the existence of the essential elements of the respective crimes but also to the nature and severity of those elements. The majority of this Court holds:
“If the jury had believed T.D.T. and found he was simply disciplining his children, then the jury would have had to acquit him. If the jury believed the children and found that T.D.T.’s actions were not discipline, then the actions constituted child abuse. In other words, had the jury found that T.D.T. intended to cause physical injury to his children when he hit them, then the jury would necessarily have had to find T.D.T. guilty of ‘child abuse,’ which includes the ‘willful abuse’ or ‘cruel beating’ of a child by a ‘responsible person.’ § 26-15-3, Ala.Code 1975. Therefore, the refusal to instruct the jury on third-degree assault was not error.”
745 So.2d at 905. This holding ignores Updyke v. State, 501 So.2d 566 (Ala. Crim. App.1986), which, diametrically to the contrary, specifically holds that a trial court errs to reversal in refusing an instruction on third-degree assault as a lesser included offense of child abuse when the evidence proves the child has been beaten. The Court of Criminal Appeals followed this holding in likewise reversing another child-abuse conviction in Miller v. State, 565 So.2d 275 (Ala.Crim.App.1989).
The law on the quantum and tendency of evidence that entitle a defendant to an instruction on a lesser included offense is contained in the case of Boyd v. State, 699 So.2d 967 (Ala.Crim.App.1997), as follows:
*908 “ ‘A defendant accused of a greater offense is entitled to have the trial court charge on any lesser included offense if there is any reasonable theory from the evidence to support the lesser charge, regardless of whether the state or the defendant offers the evidence. Ex parte Pruitt, 457 So.2d 456 (Ala.1984); Parker v. State, 581 So.2d 1211 (Ala.Crim.App.1990), cert. denied, 581 So.2d 1216 (Ala. 1991). A court may properly refuse to charge on a lesser included offense ... when ... it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense.... Anderson v. State, 507 So.2d 580 (Ala.Crim.App.1987)....”’ (Emphasis added.)
699 So.2d at 972 (quoting Breckenridge v. State, 628 So.2d 1012, 1016 (Ala.Crim.App. 1998)). A defendant is entitled to a jury instruction submitting a lesser included offense for consideration by the jury even though the evidence supporting the theory of that lesser included offense may be “weak, insufficient, or doubtful in credibility.” Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978). See also Deming v. City of Mobile, 677 So.2d 1233, 1235 (Ala.Crim. App.1995).
The effort by the Court of Criminal Appeals, in its opinion on the case before us, to distinguish Updyke, supra, is ineffectual inasmuch as the purported distinctions are merely recitations of more and worse evidence of child abuse in the case before us than in Updyke. The defendant’s entitlement to the instruction on the lesser included offense is established by the existence of the countervailing evidence, regardless of any comparison between the weight of the evidence on one side of the issue and the weight of the evidence on the other side. Deming and Chavers, supra.
Second, the trial court further erred by admitting, over the defendant’s objection, a videotaped interview of the defendant’s teenage son, one of the alleged victims. The Court of Criminal Appeals approved the State’s offer of this videotape under Rule 801(d)(1)(B), Ala. R. Evid., allowing out-of-court declarations “consistent with the declarant’s testimony and ... offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.” Some of the boy’s videotaped statements, however, were not consistent with his testimony but were beyond it in scope and substance and were highly prejudicial, as these excerpts demonstrate:
“Interviewer: [Your sister] and I have been talking about some things that have been happening at home. Can you tell me what you know about it?
“Son: ... He [T.D.T.] broke it [a Nintendo video game]. Mommy told him to buy me another one [Nintendo] because I had bought it with my own money. And then he went to the store one day, he went to the Kmart one day and he bought a brand-new Nintendo, a good Nintendo, and it came with two games and he took it home. And what he did was he got the brand-new Nintendo and he put the old one in the box without the two games and he took it back and got all of his money back and he said that the two games wasn’t in there.
[[Image here]]
“Interviewer: Did you ever go to the doctor or go to the emergency room or—
“Son: No. No. I’ve been to the doctor but we didn’t tell him what the cause was from, we lied about that cause we didn’t want — I guess — to be embarrassed about anything like that.
“Interviewer: What did you go to the doctor about the time that you didn’t tell him what caused it?
“Son: I’d got a real bad headache from my Dad’s dad he had — I couldn’t lie on my back, I couldn’t swallow pills up in Maryland and my Dad’s dad, my grandfather had getting his finger and poking it and put pills in my mouth and was poking them down my throat with his *909 finger and it was choking me. That night I had a real bad headache and it lasted about two hours, I was just screaming cause I had a bad headache cause that idiot had been poking pills down me.
“Interviewer: And that’s when you went to the doctor?
“Son: Yeah.
“Interviewer: That’s the time you didn’t tell him [the doctor] what had caused it because you were embarrassed?
“Son: Shakes head affirmatively
“Interviewer: Had your Dad done anything that time or was it your granddaddy that was poking the pills?
“Son: My Dad, well both really.
“Interviewer: What had you Dad done?
“Son: My Dad was just screaming at me and he’d make every one leave the room and he’d have his belt off and he’d say that if I didn’t swallow the pill he would whip me. I have a pill in my mouth, I didn’t swallow it, it was just dissolving in there.
[[Image here]]
“Interviewer: What happened to cause /all to leave or get out, did something happen or—
“Son: No. I mean he was real, real mad that day and he’s been just shut up in his bedroom and he been real, real mad over — see he’d bought this computer game that had naked women on it and he was just flipping 'em, he had just a little mouse and he was just flipping ‘em, and it was just like January and February and all them and he was just watching it. And them, one of them, said are you going to burn the midnight oil or what you burning. Then Mommy said something, she said cut that off there’s kids in here. He got real mad and he just threw her on the sofa and began banging her with his fists into her legs and a stuff. It lasted a while, a long while and then he just — he’d be real mad.
[[Image here]]
“Son: And one time, its been a while back, he’s, he’s got real mad at Mommy before, and he’s had — he’s, he’s — a while back before I was even bom [emphasis added], Mommy had tried to leave— Mommy had left him because he’d done some things, I know cause I know why we left him. Because Mommy was going to have a baby, she was pregnant, and Daddy had hit her in the stomach somehow and it killed the baby and they had to remove it and after that Mommy left him. And then Daddy came over there with a rifle and held it on Big Mama, Big Mama’s my grandmother, Mommy’s mom, and held it on Big Mama and forced Mommy to come home.
[[Image here]]
“Interviewer: Is there anything else that happened, that we haven’t talked about?
“Son: Ah yeah um, this is the Christmas decorations this year, we had Christmas decorations up everywhere and um and my um — this is, this is about that um, my Dad had on that program with naked women and stuff and um my Mom said something and he got real mad....
“Interviewer: Did he ever um let you look at the naked women in the computer program or did he ever show you other kinds of pictures like that or any movies or anything like that?
“Son: Uh-uh, uh-uh, uh-uh [indicating the negative]. He showed it to me when he bought it. He’d bought it, he’d bought it, then he showed it to me. No, he didn’t show it to me, he’d put it under his computer.
“Interviewer: What did he show to you?
“Son: He didn’t show it to me.
“Interviewer: Did he show you the box or—
“Son: I saw a box—
“Interviewer: What did he show to you?
“Son: He’d hid it, he’d tried to hide it under his computer and one day I was *910 vacuuming and looked under the computer and I saw it. I didn’t say anything about it cause I know Mommy would get mad and then and then be another argument, so I just didn’t say anything and a while, a little later he got it out and loaded it. And then [sister] saw, we both saw, and [sister] came in there and saw it and [sister] showed me and then I saw; it and I think that [sister] told Mommy and Mommy saw it. Then Mommy went over there looking at it. Mommy didn’t look at, she was just sitting in, watching it in the living room and Daddy was just clicking the thing and it showed Miss January, February, March, April, May, June, July, all them.
“Interviewer: Where were y’all when he was doing that?
“Son: In the living room too.
“Interviewer: So you could see it, you were able to see it.
“Son: Yeah.
“Interviewer: Did he have any magazines with stuff like that in it or- — ?
“Son: I don’t know.
“Interviewer: Did he have any movies, videos that he watched with stuff like that in it?
“Son: Yeah.
“Interviewer: Did you ever see any of those?
“Son: Uh-uh [indicating the negative], I haven’t. He’d tell [sister] and me to go to bed, but I could hear it.”
The erroneous admission of these videotaped statements cannot be validly dismissed as harmless error on the premise that the legal evidence in this case was strong or overwhelming, for such a premise begs the question. The only evidence against the defendant consisted of or derived from the words of the defendant’s wife and two children — either their words in the form of their in-court testimony or their words as related or analyzed by the other witnesses. The fundamental question to be decided by the jury was whether those words were true. If we characterize the evidence in this case as strong or overwhelming, we are assuming that those words are true. If we respect the prerogative of the jury to find the words to be false, we cannot say the evidence is strong or overwhelming. A holding that the admission of this videotape is harmless is tantamount to a holding that, since the defendant’s wife and children had spoken many adverse words about him, more and worse adverse words could not hurt. Obviously the illegally admitted inflammatory contents of the videotape increased the likelihood that the jury would find the words of the defendant’s wife and children to be true.
Third, I respectfully dissent from the holding of the majority that the trial judge’s omission of the words “reasonably believes” from his instruction on parental discipline pursuant to § 13A-3-24, Ala. Code 1975, was harmless error. The parental discipline statute requires the State to prove not only that the parent’s acts were unreasonable but also that the parent’s beliefs about those acts were unreasonable. The majority holding that the trial judge’s omission of the words “reasonably believes” from his jury instruction was harmless confuses these two essential elements of the ease against the parent, subtracts from the requisite proof the essential element of the unreasonableness of the parent’s beliefs regarding his acts, and thereby contradicts the initial holding that “the trial court erred in not including the phrase ‘he reasonably believes’ in the jury instruction.” 745 So.2d at 904. The elimination of this element is tantamount to a holding, contrary to law, that the jury could not believe some of the prosecutor’s evidence without believing all of it and therefore could not possibly find the defendant’s beliefs to be reasonable.
Finally, the trial judge committed still another error, one which did not necessarily prejudice the defendant but which does need discussion to correct the analysis by the Court of Criminal Appeals. The trial *911 judge did err in allowing, over the defendant’s objection and without the predicates required by §§ 15-25-31 and 15-25-32, Ala.Code 1975, the witness, a school counselor, to testify to out-of-court statements supposedly made by the defendant’s teenage son. The Court of Criminal Appeals opines that these statements were not hearsay because, as the State contended at trial,
“[t]he State was not trying to prove the truth of the matter asserted in the statements to the children’s school counselor or the interviewer, but, rather to show what instigated the investigation that resulted in the charges against T.D.T. and what led school officials to contact the Department of Human Resources.”
T.D.T., 745 So.2d at 894. The problem with this analysis is that “what instigated the investigation ... and ... led school officials to contact the Department of Human Resources” was not material to any issue in the case, as the investigators and school officials were not on trial.
The admission of this testimony cannot be excused by the hearsay-rule exception allowing proof of a prior consistent statement to rebut a charge of recent fabrication by a witness. The theory of this exception is that a witness’s having previously made a statement outside of court consistent with his or her testimony in court tends to rebut a charge that the witness fabricated the testimony in the interim and therefore tends to prove the truth of the witness’s in-court testimony. The truth of the matter stated by the witness in the prior consistent statement is essential to this theory, inasmuch as the purpose of introducing the prior consistent statement is to prove the truthfulness of the witness’s in-court testimony. The State would hardly contend that it could rehabilitate its witness by introducing a prior consistent false statement uttered outside of court by that witness. The trial court in the case before us, however, specifically foreclosed the jury from considering the testimony at issue for the truth of the matter stated outside of court by the alleged minor victims. The trial judge, consistently with the immaterial purposes for which the State told him it was offering the testimony, gave the jury a limiting instruction as follows:
“THE COURT: Ladies and gentlemen, let me give you some limited instructions. I believe you will hear some testimony now on conversations that took place allegedly between the alleged victims and this counselor.
“Now, the Court will allow you to hear that. But you do not consider it — I’m not allowing it in for the truth of what’s contained in the statements. Do you follow me? I’m allowing it in to show the status or state of mind that existed, perhaps.
“And I’ll try to give you an example. Let us say we were trying a man to see if he was insane. That was the issue. And somebody comes in and says: I saw him out in the park yesterday. And he was out there screaming and preaching and saying he was God. We would allow that in; not for whether or not he’s God. Do you follow me? That’s what he’s saying. But whether or not you can consider it in determining whether he’s insane.
“Now, I don’t think you’re going to hear anything you haven’t heard already. But I will allow the counselor to testify that certain statements were made to her. It doesn’t necessarily mean they’re true.” (R. 282-83.) (Emphasis added.)
The trial court thereby eliminated from consideration by the jury the only arguably material purpose for this testimony and left for the jury only the immaterial and prejudicial purposes of showing, in the words of the Court of Criminal Appeals, “what instigated the investigation that resulted in the charges against T.D.T. and what led school officials to contact the Department of Human Resources.”
As a practical matter, however, the particular statements by the defendant’s teenr *912 age son, as recounted by the witness to the jury, were comparatively innocuous and were cumulative with the boy’s own in-court testimony. Thus this particular error does not require reversal, although the first three errors discussed in this dissent do.
ENGLAND, J., concurs.